UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHANNON MORRIS, an individual,
MELISSA LEE, an individual, and
KEVIN RAFFERTY, an individual.

               Plaintiffs,

    -against-                                  **COMPLAINT WITH
JURY TRIAL DEMAND**

NEW YORK STATE POLICE,                    Civil Case No.:  1:16-CV-164
MARGARET NANCY POULIN, individually and in her official             (DNH/DJS)
capacity as New York State Police Captain,
TIMOTHY MUNRO, individually and in his official
capacity as New York State Police Major,
JULIE A. PIZZIKETTI, individually and in her official
capacity as Director of Biological Science,
New York State Police Forensic Investigation Center,
RAY WICKENHEISER, individually and in his official
capacity as Director, Crime Lab System, New York State
Police Forensic Investigation Center
SUPERINTENDENT JOSEPH D'AMICO, individually and in his official capacity as
Superintendent of the New York State Police; and
JOHN DOE #1 individually and in his official capacity as an official, officer, agent,
employee and/or representative of the New York State Police,

               Defendants.
_____

## COMPLAINT

      Plaintiffs, Shannon Morris, Melissa Lee, and Kevin Rafferty, by and through their

attorneys, Bailey, Kelleher & Johnson, P.C., as and for their complaint, allege as follows:

## NATURE OF THE ACTION

      Plaintiff Shannon Morris was an employee of the Defendant, New York State Police,

employed in the New York State Police Forensic Investigation Center ["New York State Police

Crime Lab"] located in Albany, New York.  Plaintiffs Melissa Lee, and Kevin Rafferty are

employees of Defendant New York State Police currently employed in the New York State

Police Forensic Investigation Center located in Albany, New York. This case concerns Defendants' New York State Police, Margaret Nancy Poulin, Timothy Munro, Julie A. Pizziketti, Ray Wickenheiser, Superintendent Joseph D'Amico, and John and Jane Does (hereinafter referred to collectively as "Defendants") retaliation against the Plaintiffs for their advocacy of the TrueAllele Casework method of DNA analysis and match statistics and criticism of the State Police Crime Lab's use of the Combined Probability of Inclusion [CPI] statistic for DNA mixture profiles, the retaliation against the Plaintiffs for the development and implementation of Lean Six Sigma in the DNA casework section of the New York State Police Crime Lab, and the retaliation against the Plaintiffs by Defendants Pizziketti and Wickenheiser for Plaintiffs reporting that Defendant Julie A. Pizziketti was providing expert testimony in scientific fields in which she was not qualified. As well as, the discrimination and disparate treatment of the Plaintiffs by Defendants based on their gender and the sexual harassment of Plaintiff Kevin Rafferty by Defendant Poulin. This case further involves the retaliation against Plaintiffs Lee and Rafferty for complaining of civil rights violations, filing a Charge of Discrimination with the EEOC and testifying in Plaintiff Shannon Morris' arbitration. Lastly, this case involves the defamation of all Plaintiffs by Defendants Ray Wickenheiser and Timothy Munro and the violation of the rights of all Plaintiffs secured by the Equal Protection Clause against Defendants Julie A. Pizziketti, Ray Wickenheiser, Timothy Munro, Superintendent Joseph D'Amico, and John and Jane Does.

This is a civil action seeking damages arising out of Defendants' violation of the rights secured by the First Amendment of the United States Constitution, Defendants' violations of Title VII of the Civil Rights Act, as amended in 1991, violations of the New York State Human

Rights Laws, violations of rights secured by the Equal Protection Clause, and Defendants' defamatory statements.

## THE PARTIES

### Plaintiffs

#### *Shannon Morris*

1.      Plaintiff Shannon Morris is an adult female and a citizen of the United States of America who currently resides in the Northern District of New York.

2.      At all times relevant to this action, Plaintiffs Shannon Morris was a member of a protected class as described by NYSHRL pursuant to New York Executive Law §290 et. seq. and as described by Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 USC 2000e et seq.

3.      Plaintiff Shannon Morris has been employed by the New York State Police since 1997.

4.      At all times herein referenced, Plaintiff Shannon Morris was the Associate Director of Biological Sciences for the New York State Forensic Investigation Center.

5.      As Associate Director, Plaintiff Shannon Morris' direct supervisor was Defendant Julie A. Pizziketti.

6.      Between Plaintiff Shannon Morris' date of hire in 1997 through June 2014, Plaintiff Morris had never received a personnel complaint against her.

7.      In July of 2014 Plaintiff Morris received her first personnel complaint.

8.      Over a year after receipt of the Complaint, after filing a Charge of Discrimination against the Defendants, Plaintiff Morris received a determination that the Complaint was unsubstantiated.

9.      Between 2010 through December 2015, Plaintiff Shannon Morris was a continuous advocate of the TrueAllele method of statistically evaluating DNA evidence.

10.      Beginning in 2012 through December 2015, Plaintiff Shannon Morris was openly critical of certain administrators, including Defendant Julie A. Pizziketti, in the Crime Lab allowing scientists to provide questionable DNA statistics in criminal cases and allowing staff members to perform questionable casework examinations.

11.      Plaintiff Shannon Morris pioneered the implementation of Lean Six Sigma, a program designed to increase efficiency in the DNA section, improve the quality of DNA reports, increase analyst productivity and eliminate the DNA backlog in the Crime Lab.

12.      Lean Six Sigma also resulted in reports and tracking of analyst errors.

13.      In the Fall of 2015, Plaintiff Shannon Morris reported to Defendant Poulin that Defendant Julie A. Pizziketti was testifying as an expert in criminal cases in areas in which she was neither competent nor proficient to testify.

14.      Between 2013 through present, Plaintiff Shannon Morris was subjected to continuous disparate treatment based on her gender.

15.      Between 2014 through present, Plaintiff Shannon Morris was subjected to multiple instances of retaliation for speaking on matters of public concern.

16.      On December 30, 2014, Plaintiff Shannon Morris was removed from her job duties and segregated from the Crime Lab.

17.      On February 24, 2015, Plaintiff Shannon Morris received a Notice of Discipline seeking her termination.

18. The February 24, 2015 Notice of Discipline alleged that Plaintiff Shannon Morris improperly shared information regarding the TrueAllele training project with her subordinates and lied about cheating on the TrueAllele training.

19. Male scientists, with the exception of Plaintiff Kevin Rafferty, who engaged in the same behavior as Plaintiff Shannon Morris, were not removed from their duties.

20. Male scientists, with the exception of Plaintiff Kevin Rafferty, who engaged in the same behavior as Plaintiff Shannon Morris, were not segregated from the Crime Lab.

21. Male scientists, with the exception of Plaintiff Kevin Rafferty, who engaged in the same behavior as Plaintiff Shannon Morris, were not charged with discipline.

22. Plaintiff Shannon Morris was singled out for discipline because of her speech on matters of public concern.

23. Plaintiff Shannon Morris was singled out for discipline because of her gender.

24. Between February 2015 through present, Plaintiff Shannon Morris has further been the target of multiple defamatory comments by Defendants Wickenheiser and Munro.

25. On January 21, 2016 Plaintiff Shannon Morris was terminated after 18 years of unblemished service with the New York State Police.

### *Melissa Lee*

26. Plaintiff Melissa Lee is an adult female and a citizen of the United States of America who currently resides in the Northern District of New York.

27. At all times relevant to this action, Plaintiffs Melissa Lee was a member of a protected class as described by NYSHRL pursuant to New York Executive Law §290 et. seq. and as described by Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 USC 2000e et seq.

28.     Plaintiff Melissa Lee has been employed by the Division of the New York State Police since June 1997.

29.     At all times herein referenced, Plaintiff Melissa Lee was employed as a Supervisor of Forensic Sciences in the Biological Sciences section of the New York State Forensic Investigation Center.

30.     As a Supervisor, until November 5, 2014, Plaintiff Melissa Lee's direct supervisor was Plaintiff Shannon Morris.

31.     Between June 1997 through October 2014, Plaintiff Lee had an unblemished employment record.

32.     Between 2010 through December 2015, Plaintiff Melissa Lee was a continuous advocate of the TrueAllele method of statistically evaluating DNA evidence.

33.     Beginning in 2012 through December 2015, Plaintiff Melissa Lee was openly critical of certain administrators in the Crime Lab, including Defendant Julie A. Pizziketti, allowing scientists to provide questionable DNA statistics in criminal cases and allowing staff members to perform questionable casework examinations.

34.     Between 2013 through December 2015, Plaintiff Melissa Lee was on the implementation team for Lean Six Sigma, a program designed to increase efficiency in the DNA section, improve the quality of DNA reports, increase analyst productivity and eliminate the DNA backlog in the Crime Lab.

35.     Lean Six Sigma also resulted in reports and tracking of analyst errors.

36.     Plaintiff Melissa Lee reported to Plaintiff Shannon Morris that Defendant Julie Pizziketti was testifying as an expert in criminal cases in areas in which she was neither competent nor proficient to testify.

37.     Between 2013 through present, Plaintiff Melissa Lee was subjected to continuous disparate treatment based on her gender.

38.     Between 2014 through present, Plaintiff Melissa Lee was subjected to multiple instances of retaliation for speaking on matters of public concern.

39.     On February 24, 2015, Plaintiff Melissa Lee received a Notice of Discipline seeking her termination.

40.     The February 24, 2015 Notice of Discipline alleged that Plaintiff Melissa Lee improperly shared information regarding the TrueAllele training.

41.     Male scientists, with the exception of Plaintiff Kevin Rafferty, who engaged in the same behavior as Plaintiff Melissa Lee, were not removed from their duties.

42.     Male scientists, with the exception of Plaintiff Kevin Rafferty, who engaged in the same behavior as Plaintiff Melissa Lee, were not segregated from the Crime Lab.

43.     Male scientists, with the exception of Plaintiff Kevin Rafferty, who engaged in the same behavior as Plaintiff Melissa Lee, were not charged with discipline.

44.     Plaintiff Melissa Lee was singled out for discipline because of her speech on matters of public concern.

45.     Plaintiff Melissa Lee was singled out for discipline because of her gender.

46.     Between January 2015 through present, Plaintiff Melissa Lee has been the target of multiple defamatory comments by Defendants Wickenheiser and Munro.

47.     Since September 2015 through present, Plaintiff Melissa Lee has been subject to continuous retaliation for complaining of civil rights violations, filing a Charge of Discrimination with the EEOC and testifying on behalf of Plaintiff Shannon Morris in Plaintiff Morris' arbitration with Defendant New York State Police.

## *Kevin Rafferty*

48.      Plaintiff Kevin Rafferty is an adult male and a citizen of the United States of America who currently resides in the Northern District of New York.

49.      At all times relevant to this action, Plaintiff Kevin Rafferty was a member of a protected class and/or affiliated with members of a protected class as described by NYSHRL pursuant to New York Executive Law §290 et. seq. and as described by Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 USC 2000e et seq.

50.      Plaintiff Kevin Rafferty has been employed by the Division of the New York State Police since June 1996.

51.      At all times herein referenced, Plaintiff Kevin Rafferty is employed as a Supervisor of Forensic Sciences in the Biological Sciences section of the New York State Forensic Investigation Center.

52.      As a Supervisor, until November 5, 2014, Plaintiff Kevin Rafferty's direct supervisor was Plaintiff Shannon Morris.

53.      Between June 1996 through October 2014, Plaintiff Kevin Rafferty had an unblemished employment record.

54.      Between 2010 through December 2015, Plaintiff Kevin Rafferty was a continuous advocate of the TrueAllele method of statistically evaluating DNA evidence.

55.      Beginning in 2012 through December 2015, Plaintiff Kevin Rafferty was openly critical of certain administrators in the Crime Lab allowing scientists to provide questionable DNA statistics in criminal cases and allowing staff members to perform questionable casework examinations.

56.     Between 2013 through December 2015, Plaintiff Kevin Rafferty was on the implementation team for Lean Six Sigma, a program designed to increase efficiency in the DNA section, improve the quality of DNA reports, increase analyst productivity and eliminate the DNA backlog in the Lab.

57.     Lean Six Sigma also resulted in reports and tracking of analyst errors.

58.     Plaintiff Kevin Rafferty reported to Plaintiff Shannon Morris that Defendant Julie Pizziketti was testifying as an expert in criminal cases in areas in which she was neither competent nor proficient to testify.

59.     In or around October 2014, Kevin Rafferty spoke to Crime Lab administrators in support of Plaintiffs Shannon Morris and Melissa Lee.

60.     From December 30, 2014 through present, Plaintiff Kevin Rafferty was subjected to continuous disparate treatment based on his association with the female Plaintiffs.

61.     Between 2014 through present, Plaintiff Kevin Rafferty was subjected to multiple instances of retaliation for speaking on matters of public concern.

62.     On February 24, 2015, Plaintiff Kevin Rafferty received a Notice of Discipline seeking his termination.

63.     The February 24, 2015 Notice of Discipline alleged that Plaintiff Kevin Rafferty improperly shared information regarding the TrueAllele training.

64.     Male scientists who engaged in the same behavior as Plaintiff Kevin Rafferty were not removed from their duties.

65.     Male scientists who engaged in the same behavior as Plaintiff Kevin Rafferty were not segregated from the Crime Lab.

66.     Male scientists who engaged in the same behavior as Plaintiff Kevin Rafferty were not charged with discipline.

67.     Plaintiff Kevin Rafferty was singled out for discipline because of his association with female scientists.

68.     Plaintiff Kevin Rafferty was singled out for discipline because of his speech on matters of public concern.

69.     Between January 2015 through present, Plaintiff Kevin Rafferty has been the target of multiple defamatory comments by Defendants Wickenheiser and Munro.

70.     Beginning on May 11, 2015 continuing through November 2015, Plaintiff Kevin Rafferty was the subject of ongoing sexual harassment by his superior Defendant Margaret Nancy Poulin.

71.     Since September 2015 through present, Plaintiff Kevin Rafferty has been subject of continuous retaliation for complaining of civil rights violations, filing a Charge of Discrimination with the EEOC and testifying on behalf of Plaintiff Shannon Morris in Plaintiff Morris' arbitration with Defendant New York State Police.

### *Defendants*

72.     Defendant New York State Police is an executive agency of the State of New York with an office located at 1220 Washington Avenue, Building 22, Albany, New York 12226-2252.

73.     At all times relevant to this action, Defendant New York State Police is an "employer" of the Plaintiffs as that term is defined by the NYSHRL under New York Executive Law §292(5) and as defined by 42 USC 2000e(b).

74.     At all times relevant to this action, Plaintiffs were employees of Defendant New York State Police as that term is defined in New York Executive Law §292(6).  At all times relevant to this action, Defendant New York State Police had in excess of 500 employees.

75.     Defendant Margaret Nancy Poulin, sued herein individually and in her official capacity as a New York State Police Captain, is a resident of the State of New York.

76.     At all times relevant hereto, Defendant Poulin was an "aider or abettor" under the Human Rights Law.

77.     At all times relevant to this action, Defendant Margaret Nancy Poulin was an "employee" of the Defendant New York State Police as that term is defined by the NYSHRL under New York Executive Law §292(6).

78.     Additionally, Defendant Poulin personally participated in the unconstitutional, unlawful and tortious acts alleged herein.

79.     At all times herein relevant Defendant Poulin was a supervisor of the Plaintiffs.

80.     Defendant Timothy Munro sued herein individually and in his official capacity as a New York State Police Major, is a resident of the State of New York.

81.     At all times relevant hereto, Defendant Munro was an "aider or abettor" under the Human Rights Law.

82.     At all times relevant to this action, Defendant Timothy Munro was an "employee" of the Defendant New York State Police as that term is defined by the NYSHRL under New York Executive Law §292(6).

83.     Additionally, Defendant Munro personally participated in the unconstitutional, unlawful and tortious acts alleged herein.

84.     At all times herein relevant Defendant Munro was a supervisor of the Plaintiffs.

85.     Defendant Julie A. Pizziketti sued herein individually and in her official capacity as Assistant Director/Director of Biological Sciences New York State Police Forensic Investigation Center is a resident of the State of New York.

86.     At all times relevant hereto, Defendant Pizziketti was an "aider or abettor" under the Human Rights Law.

87.     At all times relevant to this action, Defendant Julie A. Pizziketti was an "employee" of the Defendant New York State Police as that term is defined by the NYSHRL under New York Executive Law §292(6).

88.     Additionally, Defendant Pizziketti personally participated in the unconstitutional, unlawful and tortious acts alleged herein.

89.     At all times herein relevant Defendant Pizziketti was a supervisor of the Plaintiffs.

90.     Defendant Ray Wickenheiser sued herein individually and in his official capacity as Director, Crime Lab System, New York State Police Forensic Investigation Center [New York State Crime Lab], is a resident of the State of New York.

91.     At all times relevant hereto, Defendant Wickenheiser was an "aider or abettor" under the Human Rights Law.

92.     At all times relevant to this action, Defendant Ray Wickenheiser was an "employee" of the Defendant New York State Police as that term is defined by the NYSHRL under New York Executive Law §292(6).

93.     Additionally, Defendant Wickenheiser personally participated in the unconstitutional, unlawful and tortious acts alleged herein.

94.     From December 2014 through present, Defendant Wickenheiser is a supervisor of the Plaintiffs.

95.     At all times relevant hereto, Defendant D'Amico sued herein individually and in his official capacity as Superintendent of the New York State Police is a resident of the State of New York.

96.     At all times relevant hereto, Defendant D'Amico was an "aider or abettor" under the Human Rights Law.

97.     At all times relevant to this action, Defendant Joseph D'Amico was an "employee" of the Defendant New York State Police as that term is defined by the NYSHRL under New York Executive Law §292(6).

98.     Additionally, Defendant D'Amio personally participated in the unconstitutional, unlawful and tortious acts alleged herein.

99.     At all times relevant hereto, Defendant D'Amico was a supervisor of the Plaintiffs.

100.     Defendant John Doe #1 is currently an unknown individuals who is employed in Counsel's Office for the Division of New York State Police and whose identity will be ascertained and substituted in at a later date.

101.     At all times relevant to this action, Defendant John Doe #1 is an "employee" of the Defendant New York State Police as that term is defined by the NYSHRL under New York Executive Law §292(6).

102.     At all times relevant hereto, Defendant John Doe #1 is an "aider or abettor" under the Human Rights Law.

103.     Additionally, Defendant John Doe #1 personally participated in the unconstitutional, unlawful and tortious acts alleged herein.

## JURISDICTION

104.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's New York State law claims under 28 U.S.C. § 1367.

## VENUE

105.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omission giving rise to Plaintiffs' claims occurred in this district and the Plaintiffs and Defendants reside in the Northern District of New York.

## CONDITIONS PRECEDENT

106.     On or about October 22, 2015, all Plaintiffs filed separate complaints of discrimination against Defendant New York State Police with the United States Equal Employment Opportunity Commission ("EEOC").

107.     On or about November 19, 2015, the EEOC issued separate Notices of Right to Sue to each Plaintiff.  Copies of said Notices are attached hereto as **Exhibit "A"**.

108.     Plaintiffs have commenced the instant action within the allotted time limit.

## FACTUAL ALLEGATIONS

109.     At all times relevant to this action, Plaintiffs were working as forensic scientists at the New York State Police Forensic Investigation Center.

110.     As forensic scientists, Plaintiffs' job duties involved scientific evaluation of evidence including DNA analysis.

111.     At all times relevant to this action, Plaintiffs were qualified for their jobs with Defendant New York State Police.

112.     At all times relevant to this action, Plaintiffs performed their job duties in a satisfactory manner.

113.     At all times relevant to this action, the New York State Crime Lab used the Combined Probability of Inclusion [CPI] to statistically evaluate DNA mixtures.

114.     The CPI statistical method requires forensic scientists to subjectively analyze DNA results.

115.     The subjectivity required in the CPI method in a mixed source of DNA has been criticized for being inexact thereby resulting in inculpatory and exculpatory inaccuracy.

116.     The Scientific Working Group on DNA Analysis Methods ("SWGDAM") approved Autosomal STR Typing by Forensic DNA Testing Laboratories in 2010 which resulted in the introduction of the stochastic threshold in the analyzing DNA data.

117.     The interpretation guidelines for implementation of the stochastic threshold with the CPI method results in mixed DNA profiles that are inconclusive.

118.     Inconclusive results in a case necessarily results in the inability to use DNA data to enter and search profiles in the Combined DNA Index System.

119.     Inconclusive results in a case necessarily results in the inability to identify a suspect.

120.     Inconclusive results in a case necessarily results in violent criminals remaining at large for longer periods of time or indefinitely.

121.     The use of the CPI method in the Crime Lab resulted in a debate within the Crime Lab as to whether a match statistic could be arrived at from certain mixed sources of DNA.

122.     If a match statistic could not be obtained the report was inconclusive.

123.    If a match statistic could be obtained, the result would be reported to prosecutors in a DNA report.

124.    When analyzing DNA data using the CPI method all conclusions about a profile are supposed to be made without a reference sample, meaning the analysts should not be suspect-centric by using a reference profile to interpret DNA.

125.    When analyzing DNA data using the CPI method, mixed source DNA statistics could not be reported if the case involved related individuals because the CPI method could not account for the shared DNA between related individuals.

126.    The Plaintiffs saw this subjectivity and bias within the Crime Lab and became advocates for TrueAllele.

127.    Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty routinely objected to the Crime Lab inappropriately applying the CPI statistic on mixed source DNA because of the inaccuracy and subjectivity of the results.

128.    Defendant Julie Pizziketti routinely encouraged forensic scientists to use the CPI method on mixed source DNA from related individuals.

129.    Defendant Pizziketti permitted and encouraged scientists to issue reports and testify as to DNA results obtained using the CPI method on mixed source DNA that included related individuals.

130.    Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty strongly opposed using the CPI method on mixed source DNA that included related individuals.

131.    In response to Defendant Pizziketti's insistence on using the CPI method in cases involving related individuals, Plaintiff Shannon Morris contacted the Scientific Working Group

on DNA Analysis Methods (SWGDAM) regarding the appropriateness of the CPI method in such cases.

132.    Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty were outspoken and openly objected to Defendant Pizziketti's use of the CPI method on mixed source DNA that included related individuals.

133.    Plaintiff Melissa Lee refused to sign off on supervisory reviews where the CPI method was used in mixed source DNA involving related individuals.

134.    Defendants, including but not limited to Julie Pizziketti, were aware that Plaintiff Melissa Lee refused to sign off on a supervisory review on a case that Defendant Pizziketti approved.

135.    Defendants, including but not limited to Julie Pizziketti, were aware of Plaintiffs objections to the Crime Lab's use of the CPI method.

136.    Defendants, including but not limited to Julie Pizziketti, were aware that Plaintiff Morris had contacted SWGDAM in response to her use of the CPI method on DNA data involving related individuals.

137.    Defendant Wickenheiser knew or should have known that Defendant Pizziketti encouraged and permitted scientists to use Crime Lab's use of the CPI method on mixed source DNA that included related individuals.

138.    Defendant Wickenheiser knew that Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty were outspoken and openly objected to Defendant Pizziketti's use of the CPI method on mixed source DNA that included related individuals.

139.    Defendant John Doe #1 knew that Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty were outspoken and openly objected to Defendant Pizziketti's use of the CPI method on mixed source DNA that included related individuals.

140.    Defendant Pizziketti routinely engaged in and permitted other scientists to engage in "suspect-centric" DNA analysis.

141.    Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty were outspoken and openly objected to forensic scientists engaging in "suspect-centric" DNA analysis in the Crime Lab.

142.    Defendants Pizziketti and Wickenheiser allowed scientists to testify to questionable DNA results.

143.    Defendant John Doe #1 as counsel for the New York State Police approved the practice of Crime Lab scientists testifying as to questionable DNA results.

144.    In 2001, the Biological Sciences Section of the Lab, under the leadership of Dr. Barry Duceman, began introducing a new method of DNA analysis, TrueAllele.

145.    The State of New York entered into a contract with Cybergenetics to train its forensic scientists in the TrueAllele software.

146.    TrueAllele, created by Cybergenetics, is a computerized DNA interpretation system that infers genetic profiles from DNA samples.

147.    TrueAllele involved a completely different method of analyzing DNA evidence; it varied from the methods previously used by the Plaintiffs and the other forensic scientists in the Crime Lab.

148.    TrueAllele removes the subjective component from the analysis of DNA evidence.

149. TrueAllele does not use a stochastic threshold and this results in less inconclusive results than the CPI method.

150. As stated by New York State Supreme Court Justice Coccoma "The evidence shows that computerized probabilistic approaches and likelihood ratio principles used by Cybergenetics TrueAllele Casework are superior to current methods. Moreover, Cybergenetics TrueAllele Casework has been demonstrated to be one of, if not, the most advanced method of interpreting DNA profiles from mixed and low-template DNA. It has proved to be more accurate than CPI and CLR, preserves more of the identification information, eliminates examiner bias, produces a match value which human review may not, and permits standardization of mixture reporting whereas human review approaches can lead to very different match statistics on the same DNA data."[1]

142. TrueAllele, because it was a computerized DNA interpretation system, would also require fewer scientists to analyze DNA evidence in the Crime Lab.

143. Between 2001 and 2014, New York State was committed to replacing the CPI method with TrueAllele.

144. Despite this commitment, there were certain elements in the New York State Police, including but not limited to, Defendants Pizziketti, John Doe, Wickenheiser, John Doe # 1, and D'Amico, that were attempting to undermine the implementation of TrueAllele.

145. It was expected that DNA evidence previously analyzed using the CPI method would be reanalyzed using the TrueAllele software.

146. It was further expected that the TrueAllele software would show that in a large percentage of cases in which the DNA was obtained from a mixed source, the statistic obtained using the CPI method was not accurate.

---

[1] People of the State of New York v. Wakefield, Indictment No. A-812-29.

147.     In a small percentage of these cases, TrueAllele would show that the DNA evidence used in a criminal conviction was actually exculpatory rather than inculpatory.

148.     Proponents of TrueAllele, including Plaintiff Kevin Rafferty, began to compile a list of cases to be re-analyzed using TrueAllele when it went online.

149.     Defendants Pizziketti, Wickenheiser and John Doe # 1 was aware that Plaintiff Rafferty was compiling a list of cases to be re-analyzed one TrueAllele went online in the Crime Lab.

150.     Upon information and belief, Defendant John Doe #1 was aware that TrueAllele would reveal that the prosecutors used inaccurate DNA evidence results to prosecute a criminal case.

151.     John Doe # 1 opposed the implementation of TrueAllele.

152.     Upon information and belief, Defendant John Doe #1 opposed the implementation of TrueAllele in the Crime Lab because he did not want previous criminal convictions questioned.

153.     Defendant Pizziketti opposed the implementation of TrueAllele in the Crime Lab.

154.     Defendant Pizziketti's opposition to TrueAllele was due to the fact that TrueAllele would diminish the workforce and result in re-analyzing cases thereby disclosing improper activity on her part.

155.     Plaintiffs Shannon Morris, Melissa Lee, and Kevin Rafferty were openly in support of bringing TrueAllele to the Crime Lab.

156.     Plaintiffs Shannon Morris and Melissa Lee were on the implementation team for TrueAllele.

157.    The implementation of TrueAllele required the Plaintiffs and the other forensic scientists in the Crime Lab to learn an entirely new process for analyzing DNA evidence.

158.    The State of New York entered into an agreement with Cybergenetics which provided for the training of the Crime Lab's forensic scientists in the use of TrueAllele.

159.    The TrueAllele training was provided to 37 of the forensic scientists in the Crime Lab.

160.    The TrueAllele training was completed in groups; there were a total of 5 groups [Group 1, Group 2, Group 3, Group 4 and Group 5] that participated in the TrueAllele training.

161.    The TrueAllele training varied with each successive training group. That is, the TrueAllele training provided to Group 1 was different than that provided to Group 2, which was different than the training provided to Group 3 and so on and so forth.

162.    After completing preliminary readings/webinars, a 3-day course was taught by Cybergenetics instructors via a webinar.  At the conclusion of the 3-day course, the forensic scientists were then sent an e-mail directing them to the shared computer drive for their electronic lessons/exams.

163.    The TrueAllele training was broken up into Operator 1 and Operator 2 lessons/exams.

164.    The lessons were to be completed and then submitted to a Cybergenetics representative who would return feedback and grades to the forensic scientists.

165.    Once the first group of lessons was completed the forensic scientists would take an Operator 1 examination.  Following the Operator 1 examination, the forensic scientists would complete another series of lessons and then take an Operator 2 examination.

166.    Once both the Operator 1 and Operator 2 examinations were completed, the trainee would receive a paper certificate from Cybergenetics indicating that he/she had completed the training.

167.    The two TrueAllele training coordinators appointed by the Defendant New York State Police, Timothy Goble and Jay Caponera established a collaborative environment for the entire training process, including the Operator 1 and Operator 2 examinations.

168.    Trainees were given instructions that they could seek assistance from Timothy Goble, Jay Caponera, Cybergenetics representatives and/or other trainees.

169.    The 37 forensic scientists participating in the TrueAllele training collaborated extensively with one another, with the objective of teaching each other and themselves how the computer software worked.

170.    The unfettered collaboration among and between the forensic scientists was common knowledge within the Crime Lab and was accepted by the Crime Lab's leadership.

171.    The collaboration amongst and between the forensic scientists included sharing pretests, sharing informational binders, sharing lessons and answers to lessons and the forensic scientists assisting one another to answer questions on the examinations.

172.    The collaboration amongst and between the forensic scientists on the TrueAllele training had absolutely no effect on any casework.

173.    The collaboration amongst and between the forensic scientists had absolutely no effect on any DNA analysis.

174.    The collaboration amongst and between the forensic scientists did not result in the mishandling of any evidence.

175. The collaboration amongst and between the forensic scientists did not result in the inflation of any statistic/probability relative to DNA analysis.

176. The completion of the aforementioned examinations would not allow the forensic scientists to actually use TrueAllele on any cases.

177. Following the TrueAllele training, the forensic scientists would then be trained in the Crime Lab and undergo competency and proficiency testing.

178. At all times, the Plaintiffs complied with the instructions and rules of the training.

179. The TrueAllele training continued without incident until after the last group [Group 5] began the training.

180. It was at that time, on the eve of the Crime Lab's implementation of TrueAllele, that the collaborative activities previously encouraged by the Lab's leadership suddenly became the subject of intense scrutiny and criticism by the Defendants.

181. On February 24, 2014 Plaintiffs Morris, Lee, and Rafferty received Notices of Discipline and were terminated from their employment.

182. The Notices of Discipline allege that Plaintiffs Morris, Lee, and Rafferty engaged in ethical violations during TrueAllele training.

183. Allegations of ethical violations against the Plaintiffs were a pre-text to retaliate against them for speaking against their superiors on matters of public concern.

184. Allegations of ethical violations against the Plaintiffs were a pre-text to retaliation against them for their activities in implementing TrueAllele.

185. Disciplinary actions against Plaintiffs Morris, Lee, and Rafferty were instituted to prevent TrueAllele from being implemented in the Crime Lab.

186.     Following the Defendants service of Notices of Discipline, Defendant State of New York cancelled its contracts with Cybergenetics.

187.     The contracts terminated with Cybergenetics cancelled both the State's license to use the TrueAllele casework software and the TrueAllele databank software.

188.     The Crime Lab had been using the TrueAllele databank software for over 15 years prior the contract's termination.

189.     Termination of the contract for TrueAllele in the databank now requires forensic scientists to review the DNA data, resulting in increased turn-around-times and increased backlog of offender samples in the Crime Lab.

190.     In terminating the Plaintiffs, Defendants have effectively silenced all support for TrueAllele and disputes over Defendants use of the CPI method.

191.     In 2013, Defendant New York State Police hired an independent contractor to train Plaintiffs Shannon Morris, Kevin Rafferty and Melissa Lee in Lean Six Sigma.

192.     Lean Six Sigma is a management tool developed by Toyota Motors that is designed to improve performance by systematically removing waste, increasing productivity while improving quality.

193.     In January 2014, Plaintiffs Shannon Morris, Kevin Rafferty and Melissa Lee began their Lean Six Sigma training.

194.     In 2012, the Crime Lab had a backlog of 1,065 cases with an average turn-around time of 55 days.  The range in which a case could be expected to be completed before Lean Six Sigma was instituted was between 13 to 211 days.

195.     Using Lean Six Sigma the average turn-around time for cases would be 21 days with a range of 9 to 47 days per case.  This would all but eliminate the Crime Lab's backlog of cases.

196.     The implementation of Lean Six Sigma in the Crime Lab would result in faster arrest and conviction timeframes for those committing violent and non-violent crimes, and hasten the time to exonerate people.

197.     Prior to Lean Six Sigma forensic scientists on average completed 5.5 cases per month.  When Lean Six Sigma was implemented forensic scientists were required to complete an average of 12 cases per month.  The Lean Six Sigma program also focused on quality and developed a worksheet to track errors within a case.

198.     Lean Six Sigma resulted in written documentation to track errors and disagreements between forensic scientists and supervisors when questionable results were reported.

199.     Plaintiffs Shannon Morris, Kevin Rafferty and Melissa Lee were advocates of Lean Six Sigma and were affirmatively trying to implement the methodology in the Crime Lab.

200.     Defendants, including but not limited to Pizziketti, Poulin and John Doe#1, opposed the introduction of Lean Six Sigma in the Crime Lab.

201.     Specifically, Defendants were opposed to key concepts of the project that would improve monthly productivity as well as police agency and district attorney satisfaction.

202.     Full implementation of Lean Six Sigma was scheduled to be launched in the Crime Lab starting Fall 2014.

203.     Upon introduction of Lean Six Sigma, Defendants Pizziketti and Poulin's bullying of the Plaintiffs increased.

204.    In February of 2014, Plaintiffs Shannon Morris and Melissa Lee and two other females in the Crime Lab complained about the bullying by Defendant Pizziketti to Defendant Ray Wickenheiser.

205.    Despite these complaints, the bullying, disparate and retaliatory treatment of the Plaintiffs was permitted to continue and escalate.

206.    Upon information and belief, Defendant Pizziketti's actions were in retaliation for Plaintiffs actions in implementing TrueAllele and Lean Six Sigma.

207.    Shortly before Lean Six Sigma was to be finalized, Defendant Poulin commenced an investigation initially targeting Plaintiff Shannon Morris for allegations of cheating and lying on TrueAllele training.

208.    In October 2014, just as Lean Six Sigma was to being finalized in the Crime Lab, personnel complaints were filed against each of the Plaintiffs.

209.    The personnel complaints were approved and/or directed by Defendants Pizziketti, Wickenheiser, and John Doe # 1.

210.    On February 24, 2015, Plaintiffs Morris, Lee, and Rafferty received Notices of Disciplines seeking their termination.

211.    The termination of the Plaintiffs was recommended, directed and/or approved by Defendants Pizziketti, Wickenheiser, D'Amico, and John Doe # 1.

212.    The termination of the Plaintiffs eliminated the implementation teams for TrueAllele and Lean Six Sigma in the Crime Lab.

213.    The Notices of Discipline allege that Plaintiffs Morris, Lee, and Rafferty engaged in ethical violations during TrueAllele training.

214. Allegations of ethical violations against the Plaintiffs were a pre-text to retaliate against them for speaking against their superiors on matters of public concern.

215. Allegations of ethical violations against the Plaintiffs were a pre-text to retaliate against them for their actions in implementing TrueAllele and Lean Six Sigma.

216. Disciplinary actions against Plaintiffs Morris, Lee, and Rafferty were instituted to abolish the Lean Six Sigma program and use of TrueAllele in the Crime Lab.

217. Disciplinary actions against the Plaintiffs were instituted to prevent the Plaintiffs from tracking and documenting errors within the Crime Lab.

218. Disciplinary actions against the Plaintiffs were instituted to prevent the Plaintiffs from re-analyzing questionable DNA results with TrueAllele.

*Retaliation - Reports of Improper Testimony*

219. As part of the Plaintiffs' duties, they may be required to testify in criminal trials regarding DNA and serology analysis and findings relevant to the criminal cases.

220. In order to be qualified to testify on such findings, a forensic scientist must be competent and proficient in the methodology to which they are testifying.

221. A forensic scientist is competent and proficient in a methodology only after successfully completing training and a competency and proficiency examination in that methodology.

222. In the Fall of 2014, concerns were raised by Plaintiffs Kevin Rafferty and Melissa Lee to Shannon Morris that Defendant Pizziketti was testifying in criminal trials regarding DNA analyses in which she was neither competent nor proficient.

223. Plaintiff Shannon Morris reported these concerns to the Crime Lab's administrators.

224. Upon information and belief, Defendant Pizziketti was not reprimanded, or otherwise disciplined, relative to the misrepresentation of her credentials. Defendant Pizziketti continued to misrepresent her credentials with impunity.

225. Upon information and belief, Defendant Julie A. Pizziketti became aware that Plaintiffs had informed Defendant Ray Wickenheiser that she had misrepresented her credentials during at least one criminal trial.

226. In retaliation for the above-referenced reporting, Defendant Pizziketti targeted the Plaintiffs by demeaning and sabotaging them.

227. Following Plaintiffs' complaints, an investigation was commenced initially targeting Plaintiff Shannon Morris for allegations of cheating and lying during a TrueAllele training.

228. Upon information and belief, the investigation was commenced by Defendant Poulin at the insistence of Defendants Pizziketti and John Doe #1 in retaliation for the complaints raised by Plaintiff Morris and her subordinates.

229. The improper and illegal motives of Defendant Pizziketti were known and condoned by Defendants Poulin, Wickenheiser, John Doe#1 and Munro.

### *Gender Based Disparate Treatment and Hostile Work Environment*

230. In or around 2012, there was a change in the atmosphere of the Crime Lab which resulted in the continuous disparate treatment of female forensic scientists by the Crime Lab's then Assistant Director, Defendant Pizziketti.

231. The disparate treatment of female forensic scientists was known by the Crime Lab's leadership, including Defendants Poulin, Munro and Wickenheiser.

232. The disparate treatment of female forensic scientists at the Crime Lab was either condoned or deliberately ignored by Defendants Poulin, Munro and Wickenheiser.

233. The disparate treatment took the form of bullying, retaliation and, ultimately, discipline targeted at female employees.

234. Defendant Julie A. Pizziketti was the *de facto* leader of the Crime Lab.

235. In 2013, when Defendant Wickenheiser was hired as Director of the Crime Lab, Defendant Pizziketti advised Plaintiff Shannon Morris that she was told to put the new Director in his place.

236. Defendant Pizziketti routinely treated subordinate male employees more favorably than female employees.

237. In December of 2013, Defendant Pizziketti attempted to insulate and opposed pursuing discipline or a corrective action against a male forensic scientist who falsified case notes.

238. However, Defendant Pizziketti actively pursued discipline against female forensic scientists accused of cheating on the TrueAllele training.

239. Defendant Pizziketti defended and insulated the actions of two male forensic scientists who cheated on a competency examination.

240. However, Defendant Pizziketti actively pursued discipline against the Plaintiffs and other female forensic scientists who were alleged to have cheated on the TrueAllele training.

241. Defendants, including but not limited to Pizziketti, Poulin, Wickenheiser, Munro, and John Doe #1, knew of male forensic scientists collaborating on the TrueAllele training and did not pursue discipline or cause discipline to be pursued against the male scientists.

242. However, Defendant Pizziketti actively pursued discipline against the Plaintiffs and other female forensic scientists for collaborating on the TrueAllele training.

243. Defendant Pizziketti has stated publicly that the Plaintiffs are unethical and communication within the section has improved since their suspension.

244. With the exception of Plaintiff Kevin Rafferty, Defendant Pizziketti has made no such statements about male scientists engaging in the same acts as the Plaintiffs.

245. Defendant Pizziketti routinely condoned the violation of section protocols by male employees while disciplining similarly situated female employees for equal or lesser violations.

246. Defendant Pizziketti also bullied female employees while not bullying male employees under her supervision.

247. Defendant Pizziketti would continuously bully female managers at the Crime Lab and treat them differently from their male counterparts.

248. Defendant Pizziketti would continuously bully those female Crime Lab employees that reported directly to Plaintiff Shannon Morris.

249. Defendant Pizziketti would treat female Crime Lab employees who reported directly to Plaintiff Shannon Morris differently from their male counterparts.

250. Defendant Pizziketti's bullying was so pervasive that multiple female forensic scientists sought medical and/or psychological treatment due to the disparate and hostile treatment by Defendant Pizziketti.

251. Upon information and belief, one female forensic scientist was sent to the Emergency Room due to a panic attack caused by the disparate treatment.

252. Defendant Pizziketti's bullying of female forensic scientists, including the Plaintiffs, severely, continuously and unreasonably interfered with the Plaintiffs' work performance.

253. In 2013 and 2014, Plaintiffs Shannon Morris and Melissa Lee experienced persistent bullying by Defendant Pizziketti.

254. At that time, Defendant Pizziketti was Plaintiff Shannon Morris' direct supervisor and superior of Plaintiff Melissa Lee.

255. Defendant Pizziketti would yell, grunt and snarl at the Plaintiffs.

256. Defendant Pizziketti would also assign Plaintiff Morris extra work assignments, as well as purposefully exclude and isolate Plaintiff Morris in the workplace.

257. Defendant Pizziketti further publicly humiliated Plaintiff Morris at staff meetings by undermining her competency and yelling, groaning and scowling at Plaintiff Morris during work presentations.

258. Defendant Pizziketti did not treat Plaintiffs' male counterparts in this manner.

259. Defendant Pizziketti's bullying and disparate treatment of female employees was reported to the EEO Office at the State Police multiple times by her subordinates.

260. Plaintiffs Melissa Lee and Shannon Morris also reported the disparate and hostile work environment to the Crime Lab's previous Director, Dr. Barry Duceman.

261. No action was taken in response to Plaintiffs Lee and Morris' report.

262. Plaintiff Shannon Morris then reported complaints of bullying and disparate treatment by Defendant Pizziketti to the Human Resources Department of the State Police.

263. No action was taken by the Human Resources Department.

264.     In 2014, Defendant Poulin began encouraging and participating in the bullying and disparate treatment of female employees instigated by Defendant Pizziketti.

265.     In January 2014, Plaintiff Shannon Morris reported the behavior of Defendant Pizziketti to the EAP officer for the New York State Police.

266.     Plaintiff Shannon Morris also reported the disparate treatment to the Crime Lab's Director, Defendant Wickenheiser.

267.     In response to the report, a mediation session was held by Defendant Major Munro.

268.     Despite the mediation, the bullying and disparate treatment of female employees continued and escalated.

269.     The described bullying and disparate treatment by Defendant Pizziketti was known by her superiors, Defendant Wickenheiser and Defendant Munro.

270.     The described bullying and disparate treatment of the Plaintiffs has caused emotional damages and negative change and effect on the terms and conditions of the Plaintiffs' employment.

### Allegations of Cheating in the TrueAllele Training

271.     The issue of cheating on the training arose in late-September or early-October, 2014.

272.     Upon information and belief, an investigation into allegations of cheating in the TrueAllele training was recommended, approved, and/or directed by Defendants John Doe#1, Wickenheiser and Pizziketti as a means to prevent the implementation of TrueAllele and retaliate against the Plaintiffs for their advocacy of the software and criticisms of the CPI method.

273. The investigation was led by Defendant Poulin and supervised by Defendant Timothy Munro.

274. Defendants Poulin and Munro knew of the illegal and improper motives of Defendants Wickenheiser, Pizziketti, and John Doe #1.

275. Defendant Poulin has never been trained in nor does she have any sort of knowledge relating to DNA analysis or forensic science in general.

276. Defendant Munro has never been trained in nor does he have any sort of knowledge relating to DNA analysis or forensic science in general.

277. Defendant Poulin had no knowledge about the TrueAllele training program nor the manner and direction in which the training had been conducted within the Crime Lab.

278. Defendant Munro had no knowledge about the TrueAllele training program nor the manner and direction in which the training had been conducted within the Crime Lab.

279. In October 2014, Defendant New York State Police, specifically Defendant Poulin, began conducting interrogations of the forensic scientists who had participated in the TrueAllele training.

280. Questions were raised as to whether the collaboration between the scientists on the training was cheating or otherwise unethical.

281. Thirty-seven (37) forensic scientists participated in the TrueAllele training. Fifteen (15) were implicated in the investigation, including the Plaintiffs.

282. Fourteen of the fifteen implicated in the investigation were female forensic scientists.

283. Plaintiff Kevin Rafferty was the only male forensic scientist who spoke in support of Plaintiff Shannon Morris and the other female forensic scientists.

284.     Plaintiff Kevin Rafferty was the only male scientist implicated in the investigation.

285.     Several forensic scientists within the Lab, including all Plaintiffs, were interrogated regarding the TrueAllele training.  The interrogations were transcribed and subsequently released to District Attorneys and criminal defense attorneys within New York State.

286.     During the investigation, in or around November 2014, Defendant Munro stated that no one would be terminated based on the TrueAllele training.

287.     Defendants Munro, Wickenheiser, and D'Amico knew or should have known of the improper and illegal motives of Defendants Poulin, Pizziketti, and John Doe #1 against the Plaintiffs which fueled the investigation.

288.     On December 30, 2014, Plaintiffs were escorted to a conference room where an armed uniformed trooper was standing guard.

289.     On December 30, 2014, Defendants Wickenheiser and Munro informed the Plaintiffs that they would be reassigned to the New York State Police academy.

290.     On December 30, 2014, the Plaintiffs were marched as a group to the second floor in plain view of Crime Lab employees, their LIMS cards were confiscated and they were escorted from the building.

291.     Between December 30, 2014 and February 24, 2015, Plaintiffs Shannon Morris, Melissa Lee and Kevin Rafferty reported to work by going to a conference room in the New York State Police Academy.

292.     The conference rooms at the New York State Police Academy were accessible by a uniformed member.

293.     Between dates listed above, Plaintiffs spent eight hours in these conference rooms with no work assignments.

294.     In February 2015, Defendants Ray Wickenheiser and Major Timothy Munro disclosed to the Schenectady County District Attorney the interrogations taken of Plaintiffs Shannon Morris, Kevin Rafferty and Melissa Lee.

295.     At that time, the Schenectady County District Attorney was told by Defendant Wickenheiser that these Plaintiffs engaged in an ethical violation and cheated on the TrueAllele Training.

296.     At that time, the Schenectady County District Attorney was told by Defendant Munro that these Plaintiffs cheated on the TrueAllele Training and obtained a training certificate under false pretenses.

297.     The statements made to the Schenectady County District Attorney were false.

298.     Defendant Wickenheiser knew or should have known that the statements to the Schenectady District Attorney were false.

299.     Defendant Wickenheiser made said statement and disclosed the interrogations while acting with a reckless disregard for the truth.

300.     Defendant Munro knew or should have known that the statements to the Schenectady District Attorney were false.

301.     Defendant Munro made said statement and disclosed the interrogations while acting with a reckless disregard for the truth.

302.     On or about April 12, 2015, Defendants collectively and/or individually caused Plaintiffs Shannon Morris and Kevin Rafferty's names to appear in the Times Union.

303.    The Times Union article indicated that Plaintiffs Shannon Morris and Kevin Rafferty were implicated in "cheating allegations" and had been suspended without pay.

304.    Between December 30, 2014 and February 24, 2015, Plaintiffs were kept in constant fear of their job.

305.    On February 24, 2015, Plaintiffs Shannon Morris, Kevin Rafferty and Melissa Lee were served with a Notices of Discipline seeking their termination from Defendant New York State Police. At that time, these Plaintiffs were directed to leave the premises.

306.    Upon information and belief, these Plaintiffs were terminated at the direction of Defendants D'Amico and John Doe#1.

307.    Upon information and belief, the Plaintiffs were terminated to prevent TrueAllele from being implemented in the Crime Lab.

308.    The Plaintiffs were terminated by Defendants in retaliation for their advocacy of TrueAllele, criticism of the CPI method, tracking of errors by forensic scientists, and criticism of Defendants Pizziketti, Wickenheiser, and John Doe #1 routine approval of allowing scientists to testify to questionable DNA results.

309.    Plaintiff Shannon Morris' Notice of Discipline asserted that she had impermissibly shared training materials, including examination and answers with fellow forensic scientists and had failed to report the unauthorized sharing of training materials to the Crime Lab administration.

310.    The Notice of Discipline served on Plaintiff Kevin Rafferty asserted that he had impermissibly offered to share TrueAllele examination answers with other forensic scientists, had placed his TrueAllele training and examination materials on a shared drive, had failed to stop

the unauthorized sharing of information by others and had made an inaccurate statement during one of his three interrogations.

311.    The Notice of Discipline served on Plaintiff Melissa Lee asserted that she had impermissibly shared training materials, including examination and answers with fellow forensic scientists and had failed to report the unauthorized sharing of training materials to the Crime Lab administration.

312.    In accordance with the agreement between Defendant New York State Police and the Public Employees Federation Unit, Plaintiffs Shannon Morris, Kevin Rafferty and Melissa Lee filed disciplinary grievances challenging the termination sought by their respective Notices of Discipline.

313.    In or around April 2015, Defendant Ray Wickenheiser informed the remaining Crime Lab employees that the forensic scientists who were served with Notices of Discipline would not return to work despite the Public Employee Federation's grievance process.

314.    On that day, Defendant Ray Wickenheiser stated that the information was "black and white," the Plaintiffs lied and cheated and would not be returning to work.

*Ongoing acts of Retaliation and Disparate Treatment*

315.    On February 25, 2015, Plaintiff Kevin Rafferty was suspended from his job without pay.

316.    On or about May 6, 2015, Plaintiff Kevin Rafferty was offered a settlement of his grievance by counsel for Defendant New York State Police.

317.    Defendant New York State Police represented to Plaintiff Kevin Rafferty that he would return to his job as a Forensic Scientist if he settled his arbitration.

318.	Defendant New York State Police knew that Plaintiff Kevin Rafferty had been suspended without pay for almost two months, forcing him to spend down his vacation and leave time.

319.	Defendant New York State Police knew that Plaintiff Kevin Rafferty had a family that depended on his salary.

320.	Defendant New York State Police knew that Plaintiff Kevin Rafferty would not return to his previous job duties.

321.	Defendant New York State Police knowingly deceived Plaintiff Kevin Rafferty that he would return to his previous job duties if he entered into a settlement.

322.	Plaintiff Kevin Rafferty relied on this representation in entering into the settlement agreement with Defendant New York State Police.

323.	Defendant New York State Police deceived Plaintiff Kevin Rafferty the intent to induce him to enter into a settlement with the Defendant.

324.	Following his settlement with Defendant New York State Police, Plaintiff Kevin Rafferty has maintained to Crime Lab leadership that he did not commit an ethical violation.

325.	Plaintiff Kevin Rafferty was caused to enter into the settlement with Defendant New York State Police due to undue pressure, duress and the fraudulent representation of Defendant New York State Police.

326.	Pursuant to the settlement terms, Plaintiff Rafferty was to resume his previous job duties as of May 11, 2015.

327.	Since May 11, 2015, Plaintiff Kevin Rafferty has been subjected to ongoing retaliation.

328.    Upon return to work on May 11, 2015, Plaintiff Kevin Rafferty was informed that he was not allowed back into his office.  Instead, Plaintiff Rafferty was assigned to a training room on the first floor of the Crime Lab.

329.    Plaintiff Rafferty was informed by Defendant Munro that he may not be welcomed back by his colleagues because of all the extra work that he had caused.

330.    The training room was only accessible via a security card, thus isolating Plaintiff Rafferty from his colleagues in the Crime Lab.  Upon information and belief, only Defendants Munro, Wickenheiser and Poulin had access to the above-mentioned room.

331.    Since May 11, 2015, while at work, Plaintiff Kevin Rafferty has not had access to an elevator without escort and he is not allowed near the Crime Lab where he previously reported to worked through November 10, 2015.

332.    Initially, on May 11, 2015, Plaintiff Kevin Rafferty learned that Defendant Margaret Nancy Poulin was referring to Plaintiff Rafferty as her "Cal Harris".

333.    Cal Harris is an accused murderer who has been tried on three occasions for the murder of his wife.

334.    Plaintiff Kevin Rafferty has been subjected to isolation and shunning on the part of his colleagues due to the treatment condoned by Defendant Ray Wickenheiser.

335.    Plaintiff Rafferty is not allowed to attend biological sciences meetings, festive gatherings and has had his access to databases, e-mail and protocols eliminated.

336.    Plaintiff Rafferty is required to participate in a daily ethics training since his return to the Crime Lab.  He is given no other assignments than to complete ethics modules.

337.    The purported ethics training to which Plaintiff Kevin Rafferty is being subjected consists of the presentation of a hypothetical fact pattern, which oftentimes is identical to the

facts giving rise to Plaintiff Rafferty's Notice of Discipline. Plaintiff Rafferty is required to admit that the fact pattern presents an ethical violation. If Plaintiff Rafferty does not admit an ethical violation, he is directed to rework his answer.

338. On July 30, 2015, Defendant Wickenheiser visited the training room and berated Plaintiffs Kevin Rafferty and Melissa Lee for over an hour and told them that they had to admit to being unethical.

339. Defendant Ray Wickenheiser has threatened these Plaintiffs that the TrueAllele investigation could have been criminal.

340. Defendant Wickenheiser has threatened Plaintiffs Melissa Lee and Kevin Rafferty that if they do not admit to ethical misconduct in Court they could be subjected to criminal charges.

341. In September 2015, Defendant Wickenheiser told Plaintiff Kevin Rafferty that he had notified the biological sciences section that he would be returning to the lab area soon and that Plaintiff Rafferty had confessed to an ethics violation.

342. Plaintiff Kevin Rafferty refused to confess to an ethics violation.

343. Defendant Wickenheiser knew that his statement that Plaintiff Rafferty had confessed to an ethics violation was false.

344. Defendant Wickenheiser made this statement with a reckless disregard for the truth.

345. Since Plaintiff Kevin Rafferty's return to work, he has been subject to repeated offensive comments made by Defendants Poulin and Wickenheiser.

346. Defendants Wickenheiser and Pizziketti further isolated Plaintiff Kevin Rafferty and he was forbidden from attending section gatherings.

347.     On other occasions, while Defendant Poulin is in the office speaking with the female scientists, she has made disparaging comments regarding Plaintiff Kevin Rafferty.

348.     Defendant Poulin also had made a point of discussing her previous work in a bar and attire of mini-skirts to Plaintiff Kevin Rafferty.

349.     Defendant Poulin, also in an attempt to humiliate and demean Plaintiff Rafferty, required Plaintiff Rafferty to stand before her and read aloud from the Crime Lab's ethics code to her in her office.

350.     Defendant Poulin singled out Plaintiff Rafferty for a special ethics assignment. Plaintiff Kevin Rafferty later learned that he was the only one given said assignment.

351.     On another occasion, Defendant Poulin came to the conference room for the sole purpose of showing Plaintiff Kevin Rafferty and another female scientist pictures of herself when she was "young and thin".

352.     When Plaintiff Kevin Rafferty seemed disinterested, Defendant Poulin singled Plaintiff Rafferty out for violating State Police internet policy and informed Plaintiff Rafferty that she had observed him violating the internet policy that morning when Plaintiff Rafferty had been reading the news rather than viewing pictures of Defendant Poulin.

353.     On several prior occasions, Defendant Poulin had observed the female scientists watching news shows on the internet and she had, along with Defendant Ray Wickenheiser, even engaged in conversation with the female scientists about the stories on the news shows.

354.     Despite these observations, the female scientists were not singled out for policy violations.

355.     Defendant Poulin has also tried to turn the female Plaintiffs against Plaintiff Rafferty.  For example, Defendant Poulin informed the female scientists that they would be

required to sign an acknowledgment which stated that they had read the department policy on internet use. In no uncertain terms, Defendant Poulin let the female scientists know that the acknowledgement had become a necessity because of Plaintiff Kevin Rafferty.

356. On at least 2 occasions, Plaintiff Kevin Rafferty had complained to Defendant Wickenheiser about Defendant Poulin's inappropriate behavior.

357. Despite Defendant Wickenheiser's acknowledgement of the same, Defendant Wickenheiser did nothing to ameliorate the situation.

358. Despite Plaintiff Rafferty's complaints, Defendant Poulin remained Plaintiff Rafferty's direct supervisor.

359. Defendant Wickenheiser engaged in similar behavior by stating to Plaintiff that Plaintiff Rafferty was being kept separate from his colleagues so a verbal confrontation doesn't turn into a physical altercation.

360. None of Plaintiff Rafferty's female colleagues were told the same.

361. Defendant Poulin would inquire into Plaintiff Kevin Rafferty's leave status and days off.

362. Defendant Poulin did not inquire into the leave status of Plaintiff Kevin Rafferty's female counterparts.

363. Plaintiff Kevin Rafferty has complained to the Public Employee Federation's representative Ed Bradley who advised Plaintiff Rafferty to ride out the storm.

364. Plaintiff Kevin Rafferty was interviewed by the State Police Internal Affairs Bureau about the conduct of Defendant Poulin toward him.

365. Although there was ample evidence of a problem, Defendant Poulin was left supervising Plaintiff Rafferty. This continued the hostile environment.

366.     Plaintiffs Kevin Rafferty and Melissa Lee attend counseling with the Employee Assistance Program (EAP) psychologist due to the effects of the isolation being imposed upon them.

367.     On October 21, 2015, a new policy was instituted that anyone visiting EAP would need to use their own sick leave.

368.     The practice of forcing employees to use their own time to maintain mental fitness has never been imposed on other scientists or members.

369.     In addition, Plaintiff Rafferty was instructed by Defendant Poulin that he is now required to provide 24-hour notice before attending EAP counseling.

370.     Upon information and belief, the 24-hour notice policy is not applied to other Crime Lab employees.

371.     Following the filing of a Charge with the Equal Opportunity Commission (EEOC), Plaintiff Rafferty was told that he had to forfeit his office and move into a much smaller analytical space.

372.     The space was previously used to analyze sperm and was repurposed to be an office specifically for Plaintiff Rafferty.

373.     Upon meeting with Defendant Pizziketti to object to the demoralizing treatment, Plaintiff Rafferty was told the space is acceptable and he was to occupy the area.

374.     Other ethics trainees who had not filed a Charge with the EEOC were moved into offices previously used as supervisor offices.

375.     Between February 25, 2015 and May 26, 2015, Plaintiff Melissa Lee was suspended from her job without pay.

376. Plaintiff Melissa Lee subsequently settled her disciplinary grievance with Defendant New York State and she was allowed to return to work on June 1, 2015.

377. On or about May 26, 2015, Plaintiff Melissa Lee was offered a settlement of her grievance by counsel for Defendant New York State Police.

378. Defendant New York State Police represented to Plaintiff Melissa Lee that she would return to her job as a Supervisor and her previous job duties if she settled her arbitration.

379. Defendant New York State Police knew that Plaintiff Melissa Lee had been without a paycheck for over two months.

380. Defendant New York State Police knew that Plaintiff Melissa Lee had a family that depended on her salary.

381. Defendant New York State Police knew that Plaintiff Melissa Lee would not return to her previous job duties.

382. Defendant New York State Police knowingly deceived Plaintiff Melissa Lee that she would return to her previous job duties if she entered into a settlement.

383. Plaintiff Melissa Lee relied on this representation in entering into the settlement agreement with Defendant New York State Police.

384. Defendant New York State Police deceived Plaintiff Melissa Lee with the intent to induce her to enter into a settlement with the Defendant.

385. Following her settlement with Defendant New York State Police, Plaintiff Melissa Lee has maintained to Crime Lab leadership that she did not commit an ethical violation.

386. Plaintiff Melissa Lee was caused to enter into the settlement with Defendant New York State Police based on undue pressure by the Defendant, duress and the Defendant's fraudulent representation.

387.    Though Plaintiff Melissa Lee was allowed to return to work on June 1, 2015, Plaintiff Lee was not allowed to return to her prior job duties.

388.    On several dates, Plaintiff Melissa Lee was told by Defendant Ray Wickenheiser that the forensic scientists who had not entered into settlement agreements with Defendant New York State Police were cheaters and liars and those individuals would not be returning to work.

389.    Upon return to work on June 1, 2015, Plaintiff Melissa Lee was assigned to an office room on the first floor, where she was subject to enhanced supervision by the Crime Lab's administration.

390.    The office room was only accessible via a security card, thus isolating Plaintiff Lee from her colleagues in the Crime Lab. Upon information and belief, only Defendants Munro, Wickenheiser and Poulin had access to the above-mentioned room.

391.    Plaintiff Lee was informed by Defendants Munro and Wickenheiser that she may not be welcomed back by her colleagues because of all the extra work that she had caused.

392.    Since May 11, 2015, while at work, Plaintiff Melissa Lee has not had access to an elevator without escort and she was not allowed near the Crime Lab where she previously reported to worked through October 5, 2015.

393.    Since her return, Plaintiff Melissa Lee is required to attend daily ethics training.

394.    The purported ethics training to which Plaintiff Melissa Lee is being subjected to consists of the presentation of a hypothetical fact pattern, which oftentimes is identical to the facts giving rise to Plaintiff Lee's Notice of Discipline.  Plaintiff Lee is required to admit that the fact pattern presents an ethical violation.  If Plaintiff Lee does not admit an ethical violation, she is directed to rework her answer.

395.    Since returning to work on June 1, 2015, Plaintiff Melissa Lee has been subject to ongoing mockery, has been ridiculed and has been threatened that the training could have resulted in criminal charges.

396.    Since returning to work on June 1, 2015, Plaintiff Melissa Lee has been shunned on a daily basis by the Crime Lab's administrators and the general population of the Crime Lab.

397.    Since returning to work on June 1, 2015, Plaintiff Melissa Lee has been forbidden from generally engaging in any sort of office socialization and meetings.

398.    Since returning to work on June 1, 2015, Plaintiff Melissa Lee has been informed that she could not request a shift change even though shift changes are approved as a matter of course for other Crime Lab employees.

399.    In August 2015, Plaintiffs Melissa Lee and Kevin Rafferty were advised that they would be allowed to attend supervisor and casework meetings.

400.    On September 14, 2015, counsel for Plaintiffs Melissa Lee and Kevin Rafferty sent correspondence to Defendant New York State Police advising that a lawsuit would be filed for violation of the Plaintiffs' civil rights.

401.    Following this letter, Plaintiff Melissa Lee was informed in a meeting that included Defendant Julie A. Pizziketti that because of the lawsuit and a Times Union article there are reservations about including her in Crime Lab activities.

402.    Plaintiff Melissa Lee was advised that staff have a trust issue since word of lawsuit came out and this will make reintegration more difficult.

403.    Plaintiffs Melissa Lee and Kevin Rafferty have since not been allowed to attend supervisor meetings.

404. Non-party supervisors who were charged with cheating during the TrueAllele training, settled their grievances with Defendant New York State Police and did not filed an EEOC Charge have been and continue to be allowed to attend supervisor and casework meetings and social gatherings.

405. The only supervisors who settled their grievance with the New York State Police that have not been permitted to attend supervisor meetings are Plaintiffs Melissa Lee and Kevin Rafferty.

406. Despite Plaintiff Lee's insistence that she did not engage in an ethical violation, Plaintiff Melissa Lee was pressured by Defendants Munro and Wickenheiser to report the alleged ethical violations to District Attorneys for cases going to trial involving forensic scientists implicated in the TrueAllele training.

407. On January 5, 2016, Plaintiff Kevin Rafferty completed all ethics assignments and has been given no assignments or job duties to-date.

408. Since returning to work, Plaintiffs Melissa Lee and Kevin Rafferty have been continually segregated and shunned by Defendant Pizziketti.

409. Since returning to work, Defendant Pizziketti has encouraged her subordinates to shun and segregate the Plaintiffs.

410. Plaintiffs Kevin Rafferty and Melissa Lee returned within one month work of Elizabeth Staude. Elizabeth Staude is one of the 15 female forensic scientists implicated in the TrueAllele investigation who received a Notice of Discipline.

411. Plaintiff Kevin Rafferty, Plaintiff Melissa Lee and Elizabeth Staude are all supervisors at the Crime Lab.

412.     Plaintiff Kevin Rafferty, Plaintiff Melissa Lee and Elizabeth Staude each filed grievances challenging the Notices of Discipline.

413.     Plaintiff Kevin Rafferty, Plaintiff Melissa Lee and Elizabeth Staude each settled their grievance with the State of New York.

414.     Plaintiff Kevin Rafferty, Plaintiff Melissa Lee and Elizabeth Staude are similarly situated employees of the State of New York.

415.     Elizabeth Staude did not file a complaint with the EEOC regarding the State of New York's investigation into the TrueAllele training or the subsequent Notice of Discipline served on her.

416.     Since the filing of Plaintiffs Kevin Rafferty and Melissa Lee's complaints with the EEOC, Elizabeth Staude has received more favorable treatment than Plaintiffs Kevin Rafferty and Melissa Lee.

417.     Specifically, Elizabeth Staude has been given access to the Crime Lab's various drives and software to complete work assignments, whereas Plaintiff Melissa Lee must ask for assistance each time the drives/software must be accessed.

418.     In addition, Elizabeth Staude has been given access to the Crime Lab's shared "G-Drive".

419.     Plaintiffs Melissa Lee and Kevin Rafferty have been denied access to the Crime Lab's shared "G-Drive" and databases necessary to do supervisory work.

420.     These Plaintiffs continue to be shunned by their coworkers, are not given access to the Crime Lab, emails or shared computer drives.

421.     Plaintiffs Melissa Lee and Kevin Rafferty have also been prevented from joining Crime Lab technical trainings or receiving assigned readings to keep them current and compliant in their fields.

422.     The failure to provide Plaintiffs Lee and Rafferty necessary trainings negatively effects their competency and proficiency in DNA analysis.

423.     Despite the Plaintiffs return to work, Defendants have continued to call the Plaintiffs liars and cheaters.

424.     As described above, Defendants acted collectively and individually to discriminate against Plaintiffs on the basis of gender.

425.     The discriminatory and retaliatory acts include Plaintiffs removal from their job duties and segregation from their colleagues.  This separation occurred after each of the Plaintiffs had been interrogated by the New York State Police on at least one occasion.

426.     The discriminatory and retaliatory acts of the Defendants as described above, which included but were not limited to segregation, harassment, mockery, degradation, disparagement, while no such punishment was afforded to similarly situated male employees, constitutes gender discrimination.

427.     The similarly situated males include the following forensic scientists: Tim Goble, Richard Brunt, Daniel Myers, Jay Caponera, Kurt Sickinger, Peter Lewis, Russell Gettig, Brian Murphy, Darren Pelerrin and Urfan Mukhtar.  At the time of the relevant events, all of these males reported to the same chain of command.

428.     The above-mentioned forensic scientists participated and collaborated in the TrueAllele training and were subsequently interrogated by the New York State Police. These individuals shared information on training lessons, shared examination answers and while they

were aware of the sharing of information among the forensic scientists, they did not stop or report it. None of these individuals were removed from their duties, segregated from their colleagues, or received a Notice of Discipline seeking their termination.

429. The above-mentioned forensic scientists were veiled with an air of superiority, in sharp contrast to the Plaintiffs herein, who were referred to as cheaters and liars. The similarly situated male forensic scientists continued in their job duties, wholly uninterrupted by what has been described by many as the "cheating scandal."

430. The Defendants subjected Plaintiffs Shannon Morris and Melissa Lee to more restrictive terms of employment and scrutiny and otherwise subjected them to unequal terms of employment due to their female gender.

431. The Defendants subjected Plaintiff Kevin Rafferty to more restrictive terms of employment and scrutiny and otherwise subjected him to unequal terms of employment due to his gender and due to his association with the female forensic scientists.

432. Defendants committed the acts of discrimination herein especially maliciously, oppressively and/or recklessly, with the wrongful intention of injuring Plaintiffs and in conscious disregard of Plaintiffs' right to be free from discrimination on the basis of gender.

433. Defendant New York State Police, despite knowledge and adequate opportunity to learn of and remedy such misconduct of the individual Defendants, adopted, approved and ratified the acts and misconduct of Defendants Timothy Munro, Julie A. Pizziketti, Margaret Nancy Poulin and Ray Wickenheiser.

434. Defendant New York State Police took absolutely no reasonable steps to prevent the above-described discriminatory and defamatory acts.

435. Due to the acts described above, Defendants acted with malice and reckless disregard for Plaintiffs' rights.

436. As a direct, foreseeable and proximate result of Defendants' unlawful actions, all Defendants proximately caused Plaintiffs damages and injuries, including but not limited to lost opportunities, pain and suffering, emotional distress, anxiety, loss of pay and benefits, loss of career and reputation in the forensic community.

437. Plaintiffs are entitled to recover punitive and compensatory damages from Defendants.

**FIRST CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE FIRST AMENDMENT OF**
**THE UNITED STATES CONSTITUTION**
**AGAINST DEFENDANTS PIZZIKETTI, MUNRO, WICKENHEISER,**
**POULIN, D'AMICO AND JOHN DOE #1 INDIVIDUALLY**
**(42 U.S.C. §1983)**

438. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

439. "DNA is a powerful forensic tool for solving and preventing crime."[2]

440. In the course of criminal matters, DNA analysis is of extreme importance in identifying a perpetrator, or ruling out a person wrongfully accused.

441. In a criminal trial, DNA analysis may determine whether a person is set free or convicted.

442. To protect the integrity of our judicial system and to ensure the public's confidence in the judicial system it is imperative that DNA analysis is held to the highest standard.

---

[2] People v. Wakefield, Indictment No. A-812-29, Decision and Order on Frye Hearing, (NY Sup. Ct, Schenectady County, Feb. 9, 2015).

443. Concerned about the integrity of our judicial system and the public at large, Plaintiffs raised concerns as to whether the Defendants were properly using the CPI statistic to analyze DNA evidence.

444. Concerned about the integrity of our judicial system and the public at large, Plaintiffs took actions to implement Lean Six Sigma.

445. Concerned about the integrity of our judicial system and the public at large, Plaintiffs began to track errors and disagreements over DNA results in the Crime Lab through the implementation of Lean Six Sigma.

446. Plaintiffs' opposition to the Defendants' use of the CPI statistic on certain DNA evidence and its effect on the criminal justice system is a matter of public concern.

447. Plaintiffs' advocacy and participation in the implementation of TrueAllele to replace the CPI statistic is an expression of free speech on a matter of public concern.

448. Plaintiffs' advocacy and participation in the implementation of Lean Six Sigma and its effect on the Crime Lab and resulting criminal justice system is an expression of free speech on a matter of public concern.

449. Plaintiffs' reports that Defendant Pizziketti was testifying in criminal trials on scientific methodology in which she was neither competent nor proficient is an expression of free speech on a matter of public concern.

450. Defendants filed personnel complaints against the Plaintiffs because they exercised their First Amendment Right to Freedom of Speech on matters of public concern.

451. Defendants isolated, shunned, defamed, and retaliated against the Plaintiffs because they exercised their First Amendment Right to Freedom of Speech on matters of public concern.

452.     Defendants terminated the Plaintiffs because they exercised their First Amendment Right to Freedom of Speech on matters of public concern.

453.     All of the actions taken by the Defendants referred to herein were taken while acting under the color of state law and had the effect of depriving Plaintiffs of rights secured by the First Amendment to the United States Constitution.

454.     Defendants' adverse actions were motivated in response to the exercise of Plaintiffs' constitutional rights.

455.     Defendants' adverse actions caused the Plaintiffs to suffer damages and injuries, including but not limited to lost opportunities, pain and suffering, emotional distress, anxiety and loss of pay and benefits.

456.     The foregoing damages and injuries that would likely chill a person of ordinary firmness from continuing to exercise his/her right to free speech.

457.     The acts of Defendants have permanently harmed the professional reputation of the Plaintiffs.

458.     The acts of Defendants were done especially maliciously and/or recklessly, entitling Plaintiffs to recover punitive and compensatory damages.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF THE FIRST AMENDMENT
## OF THE UNITED STATES CONSTITUTION
## AGAINST DEFENDANTS WICKENHEISER, MUNRO,
## AND D'AMICO INDIVIDUALLY
## (42 U.S.C. §1983)

459.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein. .

460.     Defendants filed personnel complaints against the Plaintiffs because they exercised their First Amendment Right to Freedom of Speech on matters of public concern.

461. Defendants isolated, shunned, defamed, and retaliated against the Plaintiffs because they exercised their First Amendment Right to Freedom of Speech on matters of public concern.

462. Defendants terminated the Plaintiffs because they exercised their First Amendment Right to Freedom of Speech on matters of public concern.

463. All of the actions taken by the Defendants referred to herein while acting under the color of state law and had the effect of depriving Plaintiffs of rights secured by the First Amendment to the United States Constitution.

464. Defendant Wickenheiser knew or should have known of the illegal and improper treatment of the Plaintiffs.

465. In his position as Director, Defendant Wickenheiser was obligated to address, stop, and prevent the illegal treatment of Plaintiffs.

466. Defendant Wickenheiser failed and/or deliberately refused to address, stop, and prevent the illegal treatment of plaintiffs.

467. Defendant Munro knew or should have known of the illegal and improper treatment of the plaintiffs.

468. Defendant Munro oversaw the investigation into the TrueAllele training.

469. Defendant Munro knew or should have known that the aforementioned investigation was pursued with illegal and retaliatory motives.

470. Defendant Munro in overseeing the investigation was obligated to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiffs.

471. Defendant Munro failed and/or deliberately refused to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiffs.

472.   Defendant D'Amico as knew or should have known that the aforementioned investigation was pursued with illegal and retaliatory motives.

473.   As Superintendent of the New York State Police, Superintendent D'Amico was obligated to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiffs.

474.   In executing the Notices of Discipline against the Plaintiffs, D'Amico ratified and personally participated in the retaliatory and illegal conduct of the Defendants.

475.   All of the actions taken by the Defendants referred to herein while acting under the color of state law and had the effect of depriving Plaintiffs of rights secured by the First Amendment to the United States Constitution.

476.   Defendants' adverse actions were motivated in response to the exercise of Plaintiffs' constitutional rights.

477.   Defendants' adverse actions caused the Plaintiffs to suffer damages and injuries, including but not limited to lost opportunities, pain and suffering, emotional distress, anxiety and loss of pay and benefits.

478.   The foregoing damages and injuries that would likely chill a person of ordinary firmness from continuing to exercise his/her right to free speech.

479.   The acts of Defendants have permanently harmed the professional reputation of the Plaintiffs.

480.   The acts of Defendants were done especially maliciously and/or recklessly, entitling Plaintiffs to recover punitive and compensatory damages.

# THIRD CAUSE OF ACTION
## GENDER DISCRIMINATION IN VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT
### (Plaintiffs Shannon Morris and Melissa Lee– Defendant New York State Police)

481.    Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

482.    During the course of Plaintiffs' employment with the Defendant, New York State Police, by and through its agents and employees, discriminated against the Plaintiffs in the terms, conditions and privileges of their employment based on their gender.

483.    At all times relevant to this action, Defendant New York State Police was in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 USC 2000e et seq., in particular, 42 USC 2000e-2(a)(1), prohibiting the discrimination against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment, because of such individual's sex.

484.    The acts of the Defendants as described above, consist of segregation, harassment, mockery, degradation, disparagement and discipline, while no such discipline or treatment was afforded to similarly situated male employees constitutes gender discrimination.

485.    The retaliatory and illegal actions of the Defendants have changed the terms and conditions of the Plaintiffs' employment, constitute adverse employment actions and have resulted in injury and damages to the Plaintiffs.

486.    The aforementioned acts of discrimination have resulted in lost opportunities, irreparable damage to Plaintiffs' reputations, and emotional injury.

487.    Defendants committed the acts of discrimination herein especially maliciously and/or recklessly entitling Plaintiffs to recover punitive and compensatory damages.

# FOURTH CAUSE OF ACTION
## ASSOCIATION DISCRIMINATION IN VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT
### (Plaintiff Kevin Rafferty - Defendant New York State Police)

459.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

460.     At all times relevant to this action, Defendants were in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 USC 2000e et seq., which includes association discrimination, prohibiting an employer from making a job decision based on a protected characteristic of someone with whom the employee has some association.

461.     At all times relevant to this action, Plaintiff Kevin Rafferty, was associated with the female forensic scientists implicated in the TrueAllele training investigation.

462.     During the course of Plaintiffs' employment with the Defendant, New York State Police, by and through its agents and employees, discriminated against Plaintiff Kevin Rafferty in the terms, conditions and privileges of his employment based upon Plaintiff Kevin Rafferty's association with the aforementioned female forensic scientists.

463.     The acts of the Defendants as described above, which included but are not limited to segregation, harassment, mockery, degradation, disparagement, discipline while no such discipline or treatment was afforded to similarly situated male employees who were not associated with the female Plaintiffs, constitutes gender discrimination.

464.     The retaliatory and illegal actions of the Defendants have changed the terms and conditions of the Plaintiffs' employment, constitute adverse employment actions and have resulted in injury and damages to the Plaintiffs.

465.     The aforementioned acts of discrimination have resulted in lost opportunities, irreparable damage to Plaintiff's reputations, and emotional injury.

466.     Defendants committed the acts of discrimination herein especially maliciously and/or recklessly entitling Plaintiffs to recover punitive and compensatory damages.

**FIFTH CAUSE OF ACTION**
**GENDER DISCRIMINATION IN VIOLATION OF**
**NEW YORK STATE HUMAN RIGHTS LAW**
**(Plaintiffs Shannon Morris and Melissa Lee – All Defendants)**

467.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein. .

468.     During the course of Plaintiffs' employment with the Defendant, New York State Police, by and through its agents and employees, discriminated against the Plaintiffs in the terms, conditions and privileges of their employment based on their gender.

469.     During the course of Plaintiffs' employment with the Defendant, New York State Police, Defendants Timothy Munro, Margaret Nancy Poulin, Julie A. Pizziketti, Ray Wickenheiser, Joseph D'Amico, and John Doe #1 discriminated against the Plaintiffs in the terms, conditions and privileges of their employment based on their gender.

470.     At all times relevant to this action, all Defendants were in violation of NYSHRL, New York Executive Law Article 15 § 296(1)(a) prohibiting the discrimination against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment, because of such individual's sex.

471.     The acts of the Defendants as described above, which included segregation, harassment, mockery, degradation, disparagement, while no such punishment was afforded to similarly situated male employees, constitutes gender discrimination.

472.     The aforementioned acts of discrimination have resulted in lost opportunities, irreparable damage to Plaintiffs reputations, and emotional injury.

473.     Defendants committed the acts of discrimination herein especially maliciously and/or recklessly entitling Plaintiffs to recover punitive and compensatory damages.

**SIXTH CAUSE OF ACTION**
**GENDER ASSOCIATION DISCRIMINATION IN VIOLATION OF**
**NEW YORK STATE HUMAN RIGHTS LAW**
**(Plaintiff Kevin Rafferty– All Defendants)**

474.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

475.     At all times relevant to this action, all Defendants were in, in violation of NYSHRL, New York Executive Law Article 15 § 296(1)(a) which also protects individuals who are the victims of discriminatory actions due to their association with third persons.

476.     At all times relevant to this action, Plaintiff Kevin Rafferty, was associated with the female Plaintiffs in this matter as well as 14 other female forensic scientists who were implicated in the TrueAllele training.

477.     During the course of Plaintiff's employment with the Defendant, New York State Police, Defendants Timothy Munro, Margaret Nancy Poulin, Julie A. Pizziketti, Ray Wickenheiser, Joseph D'Amico, and John Doe #1 discriminated against the Plaintiff in the terms, conditions and privileges of their employment based on his association with female forensic scientists.

478.     The acts of the Defendants as described above, which included segregation, harassment, mockery, degradation, disparagement, while no such punishment was afforded to similarly situated male employees, constitutes gender association discrimination.

479.     Defendants committed the acts of discrimination herein especially maliciously and/or recklessly entitling Plaintiffs to recover punitive and compensatory damages.

## SEVENTH CAUSE OF ACTION PURSUANT
## TO THE NEW YORK STATE HUMAN RIGHTS LAW
## FOR DISCRIMINATION BASED ON GENDER

480.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein

481.     Defendants Defendants Timothy Munro, Margaret Nancy Poulin, Julie A. Pizziketti, Ray Wickenheiser, Joseph D'Amico, and John Doe #1, due to their power to do more than carry out personnel decisions made by others in the course of their employment, are considered "employers" under the Human Rights Law.

482.     Alternatively, said Defendants are "aiders and abettors" pursuant to N.Y. Exec. Law § 296(6) and therefore their discrimination and/or retaliation is unlawful.

483.     Said Defendants violated rights guaranteed to Plaintiffs under the Human Rights Law in that they subjected or aided and abetted others in subjecting Plaintiffs to disparate treatment and discrimination in matters relating to their employment because of their gender and a hostile work environment.

484.     Plaintiffs sustained damages by reason of the Defendants' wrongful actions and omissions and is entitled to compensation therefore.

## EIGHTH CAUSE OF ACTION
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT
## (Plaintiffs Shannon Morris and Melissa Lee - Defendant New York State Police)

485.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

486.     During the course of Plaintiffs' employment with the Defendant, New York State Police, by and through its agents and employees, discriminated against the Plaintiffs in the terms, conditions and privileges of their employment based on their gender.

487.    During the course of Plaintiffs' employment with the Defendant, New York State Police, were subjected to a continuous and pervasive hostile work environment by Defendant Julie A. Pizziketti due to their gender.

488.    As a result of the ongoing pervasive hostility by Defendant Julie A. Pizziketti Plaintiffs suffered emotional injury and damages which altered with the conditions of their employment

489.    The acts of the Defendants as described above, which included segregation, harassment, mockery, degradation, disparagement, while no such punishment was afforded to similarly situated male employees, constitutes a hostile work environment.

490.    Defendant Pizziketti committed the acts of discrimination herein with the knowledge and acquiescence of Defendant New York State Police and senior Crime Lab leadership.

**NINTH CAUSE OF ACTION**
**SEXUAL HARRASSMENT IN VIOLATION OF TITLE VII**
**OF THE CIVIL RIGHTS ACT AND NEW YORK STATE HUMAN RIGHTS LAW**
**(Plaintiff Kevin Rafferty against Defendant New York State Police**
**for the conduct of Defendant Margaret Nancy Poulin)**

491.    Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein

492.    Since May 11, 2015, Plaintiff Kevin Rafferty has been singled out by Defendant Margaret Nancy Poulin because he was the only male forensic scientist who was disciplined in connection with the TrueAllele training.

493.    Though all Plaintiffs in this matter have been at best, disrespected by Defendant Poulin, Defendant Poulin's treatment of Plaintiff Kevin Rafferty has been especially offensive and abusive.

494.    In addition to the conduct described above, Plaintiff Kevin Rafferty has been called derogatory names and subject to derogatory comments by Defendant Poulin.

495.    In approaching Plaintiff Rafferty with work, Defendant Poulin stated "I'll show you mine, if you show me yours".

496.    Following a meeting wherein several forensic scientists met with a physician from EAP [Employee Assistance Program], Defendant Poulin derisively inquired if the physician had yet determined what was wrong with Plaintiff Rafferty.

497.    Defendant Poulin often refers to her actions as a "joke." Objectively, Defendant Captain Poulin's conduct is far beyond casual joking. Rather, it is blatant harassment.

498.    The above-described are not isolated incidents; they represent a pattern of offensive, abusive and degrading conduct which has no purpose other than to cause Defendant Kevin Rafferty to feel humiliated. Any other person in Plaintiff Rafferty's situation would have been compelled to resign.

499.    The above-described unwelcomed conduct of Defendant Poulin has made the workplace atmosphere extremely intimidating and offensive and has caused Plaintiff Kevin Rafferty to become fearful of Defendant Poulin's presence because of her unpredictable behavior and offensive remarks. This is not the occasional crude banter of a boorish worker.

500.    Defendant Poulin's comments are beyond inappropriate and wholly related to the fact that Plaintiff Kevin Rafferty is the only male scientist who was terminated in relation to the TrueAllele training, as evidenced by the fact that Plaintiff Rafferty is being treated in a different manner than his female colleagues. Aside from his gender, Plaintiff Kevin Rafferty is similar situated in all relevant aspects to the female Plaintiffs herein.

501.    The acts Defendant Poulin as described above constitute sexual harassment.

502. Defendant Poulin committed the acts of harassment especially maliciously and/or recklessly entitling Plaintiff to recover punitive and compensatory damages.

503. Defendant New York State Police, as the employer of Defendant Poulin, was made aware of the above-described harassment but wholly failed to take any sort of remedial action.

504. At all times relevant to this action Defendants were in violation of Title VII of the Civil Rights Act.

505. At all times relevant to this action Defendants were in violation of NYSHRL, New York Executive Law Article 15 § 296-b which prohibits the unwelcomed conduct harassment of an employee based on gender, where such harassment has the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, or offensive working environment.

506. Defendant New York State Police, as the employer of Defendant Nancy Poulin, is vicariously liable for the acts of harassment of Defendant Poulin, as described above.

507. Defendant Margaret Nancy Poulin, pursuant to NYSHRL, New York Executive Law Article 15 § 296-b is individually liable for her acts of harassment as described above.

508. The acts of harassment and the failure to remedy the harassment constitute malicious and/or reckless behavior, entitling Plaintiff to recover punitive and compensatory damages.

**TENTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF TITLE VII**
**OF THE CIVIL RIGHTS ACT**
**(Plaintiffs Rafferty and Lee – All Defendants)**

509. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein .

510.     On September 14, 2015, Defendant New York State Police was advised that Plaintiffs had retained counsel, that they had been the target of discrimination by the State Police and intended to file a lawsuit alleging violations of their civil rights.

511.     Following September 14, 2015, as described above, Plaintiffs Melissa Lees and Kevin Rafferty were subjected to continuous retaliatory acts.

512.     Said acts were in retaliation for Plaintiffs Melissa Lee and Kevin Rafferty's filing of a Charge of Discrimination with the EEOC and notifying Defendants of their intent to file a lawsuit for violations of their civil rights.

513.     The actions of the Defendants are in violation of Title VII of the Civil Rights Act.

514.     The actions of the Defendants have resulted in emotional injury to the Plaintiffs and constitute malicious and/or reckless behavior, entitling Plaintiff to recover punitive and compensatory damages.

### ELEVENTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF TITLE VII
### OF THE CIVIL RIGHTS ACT AND THE
### FIRST AMENDMENT OF THE UNITED STATES
### CONSTITUTION
### (Plaintiffs Lee and Rafferty against All Defendants)

515.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

516.     In October, 2015, Plaintiffs Kevin Rafferty and Melissa Lee each testified in Shannon Morris' arbitration hearing regarding the disciplinary charges brought against her pertaining to the TrueAllele training.

517.     Therein, these Plaintiffs testified that neither they, nor Plaintiff Shannon Morris, engaged in ethical violations.

518. Following Plaintiffs Melissa Lee and Kevin Rafferty's testimony in Plaintiff Morris' arbitration, Plaintiffs Melissa Lees and Kevin Rafferty were subjected to continuous retaliatory acts.

519. Said acts were in retaliation for Plaintiffs Melissa Lee and Kevin Rafferty's filing of a Charge of Discrimination with the EEOC and notifying Defendants of their intent to file a lawsuit for violations of their civil rights.

520. Evidence of the Defendant New York State Police's retaliation and defamation of the Plaintiffs is evidenced by the brief filed by Counsel for the New York State Police in conjunction with the Morris arbitration which stated that these Plaintiffs' testimony were contrived and false.

521. The retaliatory and illegal actions of the Defendants have changed the terms and conditions of the Plaintiffs' employment, constitute adverse employment actions and have resulted in injury and damages to the Plaintiffs.

459. The actions of the Defendants are in violation of Title VII of the Civil Rights Act and the First Amendment to the United States Constitution.

460. The actions of the Defendants have resulted in emotional injury to the Plaintiffs and constitute malicious and/or reckless behavior, entitling Plaintiff to recover punitive and compensatory damages.

**TWELFTH CAUSE OF ACTION**
**VIOLATION OF RIGHTS SECURED BY THE EQUAL PROTECTION CLAUSE OF**
**THE FOURTEENTH AMENDMENT (42 U.S.C. §1983)**
**(All Plaintiffs – Defendants Julie A. Pizziketti, Ray Wickenheiser,**
**Margaret Nancy Poulin, Timothy Munro, Joseph D'Amico, and John Doe #1)**

461. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

462.     Plaintiffs are entitled to the equal protection of the laws pursuant to the Fourteenth Amendment of the United States Constitution.

463.     By engaging in the foregoing conduct, Defendant have violated rights guaranteed to the Plaintiffs under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in that Plaintiffs Melissa Lee and Shannon were subjected to a hostile and discriminatory environment because of their gender.

464.     By engaging in the foregoing conduct, Defendant have violated rights guaranteed to the Plaintiffs under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in that Plaintiffs were subjected to a hostile and discriminatory environment because of their gender.

465.     All of the actions taken by Defendants Ray Wickenheiser, Julie A. Pizziketti, Margaret Nancy Poulin, and Timothy Munro were done while acting under color of state law and had the effect of depriving Plaintiffs of their rights secured by the Constitution and the laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment.

466.     Defendants Ray Wickenheiser, Julie A. Pizziketti, Margaret Nancy Poulin, and Timothy Munro acted with discriminatory intent.

467.     The actions of the Defendants have resulted in emotional injury to the Plaintiffs and constitute malicious and/or reckless behavior, entitling Plaintiff to recover punitive and compensatory damages.

### THIRTEENTH CAUSE OF ACTION CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (All Plaintiffs – All Defendants)

468.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

469. By engaging in the foregoing conduct, Defendants have violated rights guaranteed to the Plaintiffs under Title VII of the Civil Rights Act in that Plaintiffs were subjected to a hostile work environment because of their gender and association with female forensic scientists.

470. The actions of the Defendants have resulted in emotional injury to the Plaintiffs and constitute malicious and/or reckless behavior, entitling Plaintiff to recover punitive and compensatory damages.

## FOURTEENTH CAUSE OF ACTION
## VIOLATION OF NEW YORK STATE CONSTITUTION
## ARTICLE 1, SECTION 11

471. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

472. Defendants through the acts of omission or commission, violated Plaintiffs' right to equal protection of the laws of the State of New York, pursuant to Article 1, §11 of the New York State Constitution in that Plaintiffs have been discriminated against on the basis of their gender. By the reasons of the Defendants wrongful acts and/or omissions, Plaintiffs have been injured and are entitled to compensation.

## FIFTEENTH CAUSE OF ACTION
## DEFAMATION AND DEFAMATION PER SE
## (All Plaintiffs- Defendant Wickenheiser)

473. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

474. On several occasions after the issue arose of possible ethical violations related to the TrueAllele training, Defendant Ray Wickenheiser maliciously and willfully defamed Plaintiffs by making statements which he knew to be false.

488. In April 2015, Defendant Ray Wickenheiser made the statement to the employees of the Crime Lab that "black and white," the Plaintiffs "lied and cheated and would not be returning to work."

475. Defendant Ray Wickenheiser acted with reckless disregard for the truth when he made the statements set forth above.

476. As a result of Defendant Ray Wickenheiser's knowingly false statement and/or reckless disregard for the truth Plaintiffs have suffered personal humiliation, mental anguish and damage to their reputation and standing in the community.

477. As a result of Defendant Ray Wickenheiser's knowingly false statement, Plaintiffs' professional careers, and thus their livelihood, have been irreparably damaged.

478. Additionally, the release of the interrogations to attorneys within New York State as described above also caused Plaintiffs to suffer loss of reputation, personal humiliation, mental anguish and damage to their reputation.

479. Defendant Ray Wickenheiser made the false statements herein especially maliciously and/or recklessly, entitling Plaintiffs to recover compensatory and punitive damages from Defendant New York State Police.

## SIXTEENTH CAUSE OF ACTION
## DEFAMATION AND DEFAMATION PER SE
### (All Plaintiffs- Defendant Wickenheiser and Timothy Munro)

459. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

460. In February 2015, Defendants Ray Wickenheiser and Timothy Munro disclosed to the Schenectady County District Attorney's Office the interrogations of the Plaintiffs stating in

sum and substance that Plaintiffs "engaged in an ethical violation and cheated on TrueAllele training".

461.    In doing so, Defendants Ray Wickenheiser and Timothy Munro represented to the Schenectady County District Attorney's Office and employees of that office that the Plaintiffs had engaged in ethical violations which called into question their credibility.

462.    The disclosure of the interrogations and statements to the District Attorney's Office were made before there had been a finding against the Plaintiffs that they had, in fact, engaged in ethical violations.

463.    The disclosures and statements made by Defendants Wickenheiser and Munro were made maliciously and/or with reckless disregard for the truth.

464.    As a result of Defendants Wickenheiser and Munro's disclosures and knowingly false statement and/or reckless disregard for the truth Plaintiffs have suffered personal humiliation, mental anguish and damage to their reputation and standing in the community.

465.    As a result of Defendants Wickenheiser and Munro's disclosures and knowingly false statement, Plaintiffs' professional careers and thus their livelihood, have been irreparably damaged.

466.    As a result of Defendants Wickenheiser and Munro's disclosures and knowingly false statements, Plaintiffs have been caused to suffer loss of reputation, personal humiliation and mental anguish.

## DEMAND FOR JURY TRIAL

467.    Plaintiffs demand a jury trial of all claims herein.

**WHEREFORE**, Plaintiffs demand judgment in an amount which will fairly and adequately compensate them for their injuries, damages, suffering and losses, in an amount that exceeds the jurisdictional limits of all lower Courts, together with the costs and disbursements of this action, including attorneys' fees and costs, punitive damages and such other and further relief as the Court may deem just and proper.

Dated:  February 15, 2016.                    Bailey, Kelleher & Johnson, P.C.


                                              By: _____s/_____
                                                       John W. Bailey
                                                       Bar Roll No.: 509251
                                              *Attorneys for Plaintiffs*
                                              Pine West Plaza 5, Suite
                                              Washington Avenue Extension
                                              Albany, New York 12205
                                              (518) 456-0082
                                              JWBailey@bkjlaw.com